I-XL EASTERN FURNITURE CO., Inc., a Pennsylvania corporation, and I-XL Furniture Co., Inc., an Indiana corporation, Plaintiffs,

v.

HOLLY HILL LUMBER COMPANY, a South Carolina corporation, Defendant.

No. 3724.

United States District Court
E. D. South Carolina,
Orangeburg Division.

Sept. 23, 1955.

Hagood, Rivers & Young, Charleston, S. C., Bernard H. Sokol, Chicago, Ill., G. L. B. Rivers, Charleston, S. C., for plaintiffs.

T. B. Bryant, Jr., Orangeburg, S. C., Robert M. Figg, Jr., Charleston, S. C., for defendant.

HOFFMAN, District Judge.

This matter. is before the Court on thirty-three (33) objections by plaintiffs and nine (9) objections by defendant filed to the report of Harry M. Lightsey, Esquire, Master, designated by order of the presiding Judge of this Court as Special Referee.

In order to give full consideration to the factual situation presented it is necessary, at the risk of perhaps needless repetition, to refer to some of the language of the Master's report. At the outset it is universally recognized that the Court is required to accept the findings of the Master unless they are based upon (1) a material error in the proceedings, (2) a mistaken view of the controlling law, (3) evidence totally unsupported, or (4) a finding which is contrary to the clear weight of all of the evidence. This being a non-jury action, the Court is faced with the alternative of adopting, modifying, or rejecting the report in whole or in part, in which latter event the Court may receive further evidence or recommit with instructions.

The I-XL Furniture Co., Inc. (hereinafter referred to as I-XL), is an established concern, incorporated under the laws of the State of Indiana, with headquarters at Goshen, Indiana, and for many years has engaged in the manufacture of kitchen cabinets. Its principal customer for such items was Montgomery Ward Company (hereinafter called Ward). In the spring of 1952 I-XL discovered that it could not keep abreast of the anticipated orders from Ward at its Goshen plant and, in an effort to effect a saving in shipping charges to Ward's eastern area, as well as supplement its output, I-XL decided to establish an assembly plant on the

eastern seaboard. As Goshen's capacity as a supplier was insufficient, I-XL sought to obtain one and, in the course of so doing, contacted the defendant, Holly Hill Lumber Company, Holly Hill, South Carolina (hereinafter referred to as Holly Hill). One Neterer, the purchasing agent for I-XL, brought about the initial contact through the services of a broker, Simmons. These parties visited Holly Hill, inspected the plant, conferred with Holly Hill's principal stockholder (Miller), and ascertained that certain additional machinery would have to be obtained. The requirements of what all parties contemplated would be a long-standing arrangement were that Holly Hill would procure the necessary materials and manufacture or machine approximately 600 separate parts of the various kitchen cabinets which I-XL was supplying Ward in order that Ward could sell complete kitchens to its customers. The specifications were to be furnished by I-XL, certain of them fitted into the basic frame, after which the basic frame and numerous parts were to be shipped to I-XL's eastern plant at Woodbury, New Jersey, where they were to be assembled by I-XL prior to delivery to Ward.

Following a subsequent visit by Miller of Holly Hill to the Goshen plant, tentative verbal arrangements were consummated without agreement as to prices. In July I-XL acquired the Woodbury plant through the assignment of a lease and the purchase of the stock of a Pennsylvania corporation, which then became a wholly owned subsidiary. The I-XL Eastern Furniture Co., Inc., was then formed and, after the acquisition of some additional space, entered into a lease for the property in New Jersey. The wholly owned subsidiary at Woodbury was, for all purposes, the same as the Indiana corporation and the Master correctly refers to the two corporations as one plaintiff. Thus the Woodbury plant constituted the eastern branch of I-XL.

On July 22, 1952, with the parties not yet having agreed on prices to be charged by Holly Hill, I-XL sent Holly Hill its purchase order No. 492, with delivery dates for what is known as SB-54 (being one of the units ultimately sold to Ward) specified as August 15, and the balance of the order designated for delivery on September 1. In bold print on the order form are the words, "Please advise us at once when we may expect shipment in part or in whole". Holly Hill never acknowledged this request until the first shipment went forward on August 30, and I-XL apparently never demanded compliance with the request. I-XL did not get its Woodbury plant in operation to receive materials until August 22. With approximately 600 separate parts to manufacture, with the required acquisition of additional machinery to commence production, with the knowledge that no manufacturer would expend approximately $6,000 in new machinery until the receipt of an order, and with an agreement that I-XL would send one of its factory men to Holly Hill to assist in initial operations, it is obvious to the Court that the parties never contemplated that time would be of the essence as to contract No. 492. In fact, plaintiff's witnesses admit that performance by Holly Hill within the times specified would have been next to impossible and that the schedule was "very tight". Even at Goshen, with the machinery all installed and adjusted, and with sufficient trained labor and supervision, performance on such a schedule would have been considered excellent.

Courts are reluctant to hold that time is of the essence in contracts for the manufacture and sale of non-existent goods, and this is particularly applicable if the goods are made to special order and are of a kind not readily salable in the general market. Corbin on Contracts, sec. 719. The underlying reason for this rule is due to the work and labor involved in manufacturing, the probability of delays, and the potential loss to the manufacturer where the buyer is permitted to reject in whole or in part.

It was not until September 3, 1952, that an agreement was reached as to

prices. In the interim one shipment had left Holly Hill for Woodbury, I-XL having directed that all of the shipments from Holly Hill should go to New Jersey. In addition, I-XL sent its factory foreman (Stouder) to Holly Hill during the middle of August and, with the exception of approximately one week, Stouder remained at Holly Hill until the middle of September. During this period some of I-XL's correspondence and telephone calls were with Stouder. Undoubtedly he knew of the details of contract No. 492 and was aware of existing conditions.

Admittedly there were defects in manufacturing, particularly in the earlier stages of work, but this is expected in the type of business conducted. Even at Goshen there was invariably a percentage of rejects. In the Holly Hill transactions there were also shortages and overages, the latter term being designated as "overages for bank" indicating that they were to apply to future shipments. As a result of visible defects Holly Hill agreed to accept the return of all defective materials and, if unsuccessful in rectifying the errors, further agreed to replace same and make up all shortages, but no time limit was mentioned as to this portion of defendant's agreement.

In accordance with the understanding between the parties, all invoices were paid by I-XL to Holly Hill upon receipt of each shipment and invoice, subject to a visible count verification. Invoices for the following shipments were paid in the amounts stated, less discount, on the dates designated:

| Date of Invoice | Amount | Date Payment Rec'd. |
|---|---|---|
| 8/30/52 | $ 4267.29 | 9/15/52 |
| 9/15/52 | 5447.78 | 9/30/52 |
| 9/27/52 | 7304.35 | 10/10/52 |
| 10/ 7/52 | 4279.04 | 10/22/52 |
| 10/28/52 | 10993.56 | 11/10/52 |
| 11/ 7/52 | 5140.23 | 11/19/52 |
| 11/15/52 | 4140.54 | 12/19/52 |

The following invoices remain unpaid:

| | |
|---|---|
| 12/ 8/52 | 10336.58 |
| 12/17/52 | 3255.54 |

Certain credit memorandums bring about a reduction in the alleged balance due by I-XL to Holly Hill, leaving a net of $13,032.19 on shipments received by I-XL.

While the parties agreed to the prompt payment of invoices, it was also understood that all defects could not be determined until the actual assembly of the cabinets *at Woodbury,* this by reason of the nature of the material and required exact fitting, and the payment in no way operated as a waiver or estoppel of I-XL's rights to return the defective parts which proved to be defective on assembly *at that location.*

The Master has discussed at length the facts leading up to his conclusion that the time limit in contract No. 492 was waived by I-XL. The Court thoroughly agrees with this conclusion if it is necessary to so hold. A waiver is the relinquishment of a legal right by the words and acts of one of the parties. In the opinion of this Court it is very doubtful that time was of the essence of contract No. 492 and, if not, the question resolves itself into what was a reasonable time under all the facts and circumstances then prevailing. Waiver would not then be an element to consider.

While it is true that, from time to time, I-XL complained of slow deliveries, shortages and replacements, it was not until the cancellation hereinafter referred to that I-XL saw fit to assert a definite right as to "time limit" on contract No. 492. In a telephone conversation on November 19, followed by a letter on November 20 (Ex. 32), I-XL urged Holly Hill to make up existing shortages enumerated under contract No. 492 due to the difficulties in operating the Woodbury plant without the items therein listed. With the sole exception of one item mentioned (which item I-XL stated was not causing any immediate

problem), Holly Hill fulfilled all requirements in a special shipment which left South Carolina on November 22 (Ex. 89). Additionally, the evidence reveals that, during the course of performance by defendant, I-XL modified its own specifications and added at least one part to be manufactured. Such variations obviously play a part in bringing about delays.

Plaintiff insists that, during the time the Woodbury operation remained in effect, not one single cabinet was assembled from what Holly Hill manufactured. One witness, Reedy, the Woodbury manager, so testified (T. 54) on direct examination, but admitted on cross-examination (T. 174, 175, 176) that some completed cabinets with a Holly Hill source were contained in eleven truckloads and seven carloads ultimately shipped from Woodbury to Goshen following the cancellation of the contract.

In summary, it may be stated that, as to contract No. 492, the so-called time limit did not become a controlling factor although delays were undoubtedly an annoyance to I-XL.

Reverting to the month of November, 1952, we find that I-XL gave Holly Hill a second order, or contract, dated November 5. Attached to this order was a schedule of delivery of parts covered thereby, according to weeks, with the option granted to Holly Hill to ship every two weeks. While still working on contract No. 492, Holly Hill commenced manufacturing under this second contract which is known as No. 785. Glancing at the items specified for delivery during the first two weeks of December (the beginning date of delivery), we find that on December 8 Holly Hill shipped all of the requirements of these first two weeks. To verify this fact it is necessary to refer to prior invoices in order to ascertain that the requirements for like parts were shipped under contract No. 492, thereby definitely establishing that the requirements of contract No. 785 had been met at the time of plaintiff's cancellation of both contracts. It is apparent that time was made the essence of contract No. 785 and that, as to this contract, I-XL did not waive any rights. It is also true that Holly Hill lived up to the schedule attached to contract No. 785, all of which furnishes no basis for cancellation of this second contract. It is certainly significant to note that I-XL entered into a second contract on November 5 in view of the fact that they now bitterly complain about defects, shortages, and delays. Furthermore, on October 22, I-XL sought information as to the possibility of taking out use and occupancy insurance on Holly Hill's plant, with loss payable to I-XL; all of which indicates at least partial satisfaction at that time.

On December 16, 1952, I-XL advised Holly Hill that they were returning "our entire accumulation of rejected stock". The Master allowed a credit of $2,300 for this returned material based solely on a weight percentage and the Court would be inclined to approve of this computation if this were the only question involved, but, in the light of the recommittal herein, the Master is instructed to reopen this phase of the evidence to permit the introduction of values as there appears in evidence a list of the returned material and it should not be too difficult to arrive at a better proof of the true credit to be allowed.

It is urged that the returned materials, arriving in South Carolina on or about December 19, created serious shortages which were never replaced by Holly Hill. This is unquestionably true and, from this standpoint, Holly Hill has not yet completed contract No. 492. However, it cannot be said that an agreement to accept returned defective materials gives cause to an immediate cancellation of a contract upon shipping same. It follows that Holly Hill was entitled to a reasonable time to replace the parts returned as defective. This it was precluded from doing because of the cancellation.

By telegram dated December 18, 1952, I-XL wired Holly Hill as follows:

"Effective immediately our PO 785 and 492 for machine parts are cancelled due to defective merchandise and late shipments. No more shipments will be accepted".

Despite this advice, the shipment of December 19 went forward and presumably was a part of the materials subsequently sent from New Jersey to Indiana. I-XL closed its Woodbury operations and, beginning on December 30 and continuing until February 13, proceeded to send all Woodbury materials to Goshen in trucks and by rail. It was not until I-XL's letter of January 15, 1953, presumably arriving in South Carolina on January 17, that Holly Hill was advised of the then transfer of parts from Woodbury to Goshen. By this time six truckloads and three carloads had gone forward. All parties admit that handling material of this type will result in breakage and other defects.

There is credible testimony to the effect that, at the time of cancellation, I-XL was undergoing a change of management resulting in the discharge of top executives and their replacement by others. While it may be a pure coincidence, it is the opinion of this Court that the change in management was the underlying reason for the cancellation of the two contracts. The Master correctly found that the cancellations were preemptory and without just cause. The decision to close the Woodbury plant was made on or about December 15 and the plant ceased operations approximately one week later.

The evidence does not reveal what Holly Hill parts were ultimately used at Goshen, but I-XL admits that "some" were satisfactory and placed into the Goshen operation. As to the balance on hand, the extent of which is unknown without an actual count, I-XL insists that it is worthless. It may well be useless at Goshen but the pertinent question is whether it was useless at Woodbury, bearing in mind that on or about December 16 all *visibly* defective material had been returned to Holly Hill. In effect,

I-XL contends that it had a legal right to rely upon the agreement to permit rejection of non-visible defective material at the time of actual assembly of the cabinets irrespective of the place of assembly.

It is mainly on the question of damages that the Court must disagree with the able report of the Master. Following the cancellation Holly Hill began pressing I-XL for the collection of its last two invoices aggregating $13,032.19 and, after ascertaining that I-XL would not permit the completion of contract No. 785 against which Holly Hill had purchased materials in advance (all of which was admittedly required in order to meet the schedule), Holly Hill insisted upon a settlement for the material on hand. I-XL, acting under its new management, contended that the delays and defective materials brought about the entire loss in the Woodbury operation, loss of sales to Ward, and loss of monies paid Holly Hill for the first seven invoices. Finally, after all settlement efforts failed, I-XL brought this action for its alleged damages, with Holly Hill denying liability and requesting damages in its behalf.

The Master correctly found no merit in I-XL's claim for alleged damage in loss of business, rent, labor, etc., incurred at its Woodbury plant. While it is perhaps unnecessary to belabor the point, it will be noted that the correspondence beginning November 19 and ending December 15 (Exs. 30, 34, 35, 40, 41) recognized the continued validity of the contract at all times, even to the statement by Holly Hill on December 9 that everything would be completed by January 1, to which statement there was no objection by I-XL. It is manifestly impossible for I-XL's alleged loss to have accrued between December 15 and December 18, the date of cancellation. Plaintiff's claim for this alleged loss is denied.

As heretofore noted, the Master allowed a credit of $2,300 for visibly defective material returned to Holly Hill on or about December 16. That some

credit should be allowed is conceded, but the formula adopted by the Master in taking a percentage of the weight load to the percentage of the average invoice price is highly speculative. Of course, damages cannot be determined to an exact science but, in view of the fact that there appears in evidence a list of the returned material, the Master should, in the opinion of the Court, take further evidence as to the cost prices of these items. If such testimony is not available, it would appear that the Master's "estimate" is probably acceptable in the absence of a better yardstick.

I-XL was also allowed a credit of $5,750 for allegedly defective material after arrival at Goshen. These defects were obviously not readily detected by the eye as the visibly defective material was returned to Holly Hill on or about December 16. It is logical to assume that there were some defects in the shipment of December 19. As to this particular truckload, the Master may take further evidence as to its condition upon arrival *at Woodbury* and, to such extent as may be reasonably shown by the testimony, allow a credit accordingly. If no such evidence is available, the Court would suggest a review of the testimony showing the average percentage of rejects heretofore estimated.

In arriving at a credit of $5,750 for the defective Holly Hill material at Goshen, the Master adopted a rather unique formula which counsel conceded in argument to be without basis in law or fact. For reasons not revealed by the evidence, the Master assumed that trial assembly of the cabinets would disclose two and one-half times as many defects as visual inspection. The Master further assumed that, since visual inspection disclosed defective material to the extent of $2,300 in all material delivered under the first and second orders (excepting the shipment from Holly Hill on December 19), the additional and non-visible defective material would aggregate $5,750. The adoption of such a formula would constitute, in the judgment of this Court, a misconception of the law of damages and is clearly erroneous.

It was never the intention of the parties that the trial assembly of cabinets would take place in Goshen. The correspondence, contracts and acts of the parties point only to Woodbury, New Jersey. It was at Woodbury that visual inspection was to be made—it was at Woodbury that non-visible defects were to be ascertained. Woodbury was the ultimate and only place of acceptance or rejection. With that in mind, what is the legal effect of the cessation of operations at Woodbury and the subsequent shipment of highly fragile materials by truck and rail to Goshen? Manifestly it is impossible to show what damages, if any, were incurred in transit to these machine parts made of small pieces of wood to an exact dimension, to say nothing of parts that were glued together.

It is fundamental that, in order to form a basis of contention on the part of the buyer, the defects must exist at the time of the sale. In this case the sale was consummated in Woodbury after visual inspection, subject only to buyer's right to return defective material subsequently discovered at the time of assembly at Woodbury. The buyer may not complain of defects due to the manner of use by him, or to his failure to take proper care of the goods, or where the inefficiency of the article is due to a number of contributing causes of which the defect in the article itself is but one. 77 C.J.S., Sales, § 185, p. 924. If this case be considered as a sale of goods "on trial or approval", it would appear that plaintiff has waived its right to reject for non-visible defects in subsequently shipping the material, without the knowledge or consent of the seller, to a location many miles distant from the place where final approval or rejection was contemplated; all of which is largely due to the nature of the fragile material. To hold otherwise would establish a rule that might permit buyers to move perish-

able goods from one place to another and then, at the final point not originally agreed upon between buyer and seller, the goods could be rejected. Baker v. J. C. Watson Co., 64 Idaho 573, 134 P.2d 613, 616. A waiver results where the stipulated trial is prevented by the buyer. 77 C.J.S., Sales, § 199, p. 941. It is the equivalent of an acceptance. The buyer, having exercised dominion over the goods in shipping same to Goshen where some of the items were used, has effectively accepted the goods and, if not, has waived its right to now complain as to non-visible defects ascertained in attempted assembly at Goshen.

Accordingly the Court holds that the Master was in error in allowing any credit for alleged defective materials after the goods were shipped on buyer's trucks and cars at Woodbury, New Jersey.

■ This brings us to a consideration of the damages allowed to Holly Hill. The invoices, aggregating $13,032.19, were correctly allowed by the Master subject, of course, to the credits hereinabove mentioned. The Master further accepted Holly Hill's uncontradicted statement that it sustained a minimum additional loss of $6,500 without regard to capital investment. This item is broken down into material (not manufactured) valued at $1,500 after deducting salvage, and parts completely or partially manufactured to be shipped to I-XL valued at $5,000. No effort was made to require Holly Hill to produce its records substantiating this loss. It is somewhat analogous to an injured man evaluating his broken toe at $5,000. Under such circumstances the Master was not required to accept the uncontradicted testimony according to the actual statement and, on recommittal, the Master shall require more competent proof of this phase of the damages allegedly sustained by Holly Hill.