MARY ANN SCHULMAN, Sometimes Known As MAR-RIANE SCHULMAN, Appellant, *v.* ALBERT S. SCHULMAN, Respondent.

No. 8339

December 21, 1976                    558 P.2d 525

*John Peter Lee* and *James C. Mahan,* Las Vegas, for Appellant.

*Wiener, Goldwater & Waldman, Ltd.,* and *Gerald M. Gordon,* Las Vegas, for Respondent.

## OPINION

By the Court, MOWBRAY, J.:

Mary Ann Schulman commenced this action by filing for divorce against Albert S. Schulman. She won a decree of divorce, but has appealed from that portion of the decree settling the property rights of the parties.

1. Mary Ann and Albert were married in 1968. The divorce proceedings were filed in 1973. At the time of the marriage, Albert, who for approximately 40 years had been in the retail and wholesale business as a market manager, meat market owner, and processor of meats, was the sole owner and proprietor of Schulman Meats and Provisions (Schulman Meats), a wholesale and retail meat business operating in Las Vegas, Nevada. The business continued as a sole proprietorship until 1972, when it was incorporated, Albert receiving all 1,000 shares of the corporation's no-par stock. The accounts receivable of the business, worth $110,532, were transferred to the corporation as a debt, rather than equity, Albert receiving a promissory note for that amount. Additionally in 1972, in order to meet standards imposed by the Food and Drug Administration (FDA), the business was expanded to include a second facility. A loan from the Small Business Administration (SBA)—originally in the amount of $300,000, but later increased to $440,000—was obtained to finance the expansion. Mary Ann was required by the SBA to sign a guaranty.

During their marriage, the parties acquired a personal residence, title taken in joint tenancy. The parties also had the use of several cars, title being held by the business. Mary Ann testified that at the time of incorporation Albert had promised orally to give her one-half of the stock in the corporation. She further testified that she had contributed her services to the business by designing advertisements.

2. The parties stipulated to the appointment of a special master to determine their property interests. A certified public accountant was appointed as the master. After conducting hearings and receiving evidence, both documentary and oral, he

filed his report. Objections were filed to the report, and after a hearing on the same, the district judge rejected certain portions and adopted, approved, and confirmed the remaining portions of the report. Mary Ann claims, on this appeal, that the district judge erred in rejecting the master's findings. She seeks reversal on the principal grounds that the district judge (1) failed adequately to compensate the community for income attributable to the husband's skill, efforts, and labors expended in the handling of his separate estate during the marriage and (2) erred in suggesting that community living expenses, paid from the income of the husband's separate estate, should be charged against community income in determining the balance of community funds. In addition, Mary Ann challenges the award of alimony. For the reasons discussed below, we have concluded that substantial precedent and evidence support the rulings under attack. Therefore, the judgment must be affirmed.

3. In his report, the master estimated Albert's business to have been worth $28,212 at the time of the marriage. The master arrived at this figure by subtracting the difference between the business's 1968 net profit and Albert's draw for that year from the book value of the business:

| | | |
|---|---|---|
| Net book value of business | | $63,196 |
| Net profit | $54,984 | |
| Albert's draw | —20,000 | |
| | | —34,984 |
| Net worth of business | | $28,212 |

The master estimated the present value of the business to be $600,000. He arrived at this figure by multiplying the estimated value of the corporation's assets in February 1974 by 50.4 percent, a formula taken from a report published by the American Meat Institute (AMI), and extrapolating to allow for normal growth to the time of valuation.

In allocating the increased value of Schulman Meats between the separate and community property, the master used the approach established in Pereira v. Pereira, 103 P. 488 (Cal. 1909), finding that Albert's personal efforts were principally responsible for the growth and continuity of the business. Under this approach, a fair return is allocated to the separate property, and the remainder of the increased value is allocated to the community. Here, the master determined 8.27 percent to be a fair return, a percentage taken from the AMI report.

The return on the separate property investment at this rate over the 7 years of the marriage was calculated to be $16,000, making Albert's separate property share of the business $44,547. The master had valued the business at $600,000; so the community share was $555,453.

The family residence was characterized as community property and valued at $75,000, less a mortgage of $32,018.12. The total community interest was therefore determined by the master to be $598,435. The master recommended that other minor assets, i.e., the family cars, be awarded to their present possessors.

4. The district judge granted Mary Ann a decree. However, he rejected as "clearly erroneous" certain portions of the master's report. NRCP 53(e)(2).[1] Specifically found erroneous was the master's determination that Albert's efforts were primarily responsible for the increase in value of Schulman Meats. Instead, the district judge attributed the increase in value to the population growth in Las Vegas during the time of the marriage, and the business's expansion made possible by the SBA loan. He rejected the *Pereira* approach used by the master and adopted the formula announced in Van Camp v. Van Camp, 199 P. 885 (Cal.App. 1921), wherein the community is allocated a share of the increased value equal to the fair value of the community services less amounts withdrawn to meet family expenses.[2] The district judge found Albert's services for the period of the marriage to be worth $318,777,

---

[1] NRCP 53(e)(2):

"In an action to be tried without a jury the court shall accept the master's findings of fact unless clearly erroneous. . . . The court after hearing may adopt the report or may modify it or may reject it in whole or in part or may receive further evidence or may recommit it with instructions."

[2] The district judge in his written decision ruled in part:

"The Master sought to apply the *Pereira* approach in the instant situation by determining a reasonable rate of return to be 8.27% based upon American Meat Institute compilations of statistics. The Court rejects this determination. Although Albert's efforts in building up the business have been substantial, the Court is persuaded that the considerable economic growth experienced by this locale during the applicable period outweighs those efforts. Furthermore, the expansion of the business is, to a large entent [sic], attributable to the Small Business Administration loan. In that Albert's personal services and the incidental services of Mary Ann were not primarily responsible for the enhancement of the business, it would be inequitable to apply a formula which effects a greater attribution of profits to the industry of the community."

predicated on a study by Robert Morris Associates reporting officers' salaries in similar businesses.[3]

SALES REVENUE

| | | |
|---|---|---|
| 1968 | $367,452 | $8,100 |
| 1969 | 2,311,135 | 51,285 |
| 1970 | 2,970,458 | 50,498 |
| 1971 | 3,539,803 | 56,637 |
| 2/28/73 | 5,219,250 | 57,412 |
| 2/28/74 | 7,961,138 | 47,767 |
| 2/28/75 | 7,846,414 | 47,078 |
| | | $318,777 |

(Sales revenue figures derived from Albert's Exhibit "G".)

The district judge computed the business income used to meet family expenses to be Albert's actual draw, estimated to be $245,507, plus $2,500 worth of meat and groceries and $15,000 in the use of cars purchased by the business. Thus, the district judge found that the family expenses exhausted a total of $263,007 of the $318,777 due for Albert's services.[4] The

| | Albert's Estimated Actual Draw |
|---|---|
| 1968 | $8,520 |
| 1969 | 47,252 |
| 1970 | 39,993 |
| 1971 | 36,541 |
| 2/28/73 | 43,091 |
| 2/28/74 | 37,160 |
| 2/28/75 | 32,948 |
| | $245,507 [sic] |
| | —17,500 |
| | $263,007 [sic] |

remaining community interest in the business was found to be $55,770, of which Mary Ann's share was $27,885.[5] Albert was ordered to pay this amount over a period not to exceed 30 months.

[3]The district judge determined Albert's fair salary by adopting a Robert Morris Associates study for officers' salaries as to percentage of total sales for the period October 1968 (beginning with the marriage) through February 1975 (the date fixed by the district judge for terminating the community). The district judge found the following:

[4]The district judge summarized the evidence before him as follows, which the record below supports:

[5]The district judge used the following computations:

| | |
|---|---|
| Fair salary | $318,777 |
| Less Albert's actual draw | —263,007 |
| | $55,770 |

The district judge rejected Mary Ann's contention that the business had been transmuted into community property because the SBA's primary intent in making its loan had been to rely on the parties' community property, rather than the separate property business by which the loan was secured. He also rejected Mary Ann's testimony that Albert had promised to give her one-half the corporate stock in 1972, the time of incorporation.

The district judge ordered a partition sale of the family residence, and equal division of the proceeds to each of the parties. Other items were, as recommended by the master, awarded to their present possessors. Mary Ann was awarded temporary alimony of $1,000 a month for 6 months.

5.  As a threshold complaint, Mary Ann argues that the district judge erred in rejecting parts of the master's report as "clearly erroneous." NRCP 53(e)(2), *supra*. We do not agree. The district judge found, and for good reason, that the AMI report upon which the master relied was inaccurate, in that it excluded a large number of small plants, such as Schulman Meats, which represent 15 percent of all meat produced.[6]

Since Schulman Meats is a small wholesale and retail operation conducting no slaughtering operation itself, the district judge did not err in regarding valuations based on a survey taken of businesses of a substantially different nature as "clearly erroneous." According to NRCP 53(e)(2), when the court finds a portion of the master's report clearly erroneous, it has broad discretion as to how to proceed. It may "adopt the report or may modify it or may reject it in whole or in part or may receive further evidence or may recommit it with instructions." Cold Metal Process Co. v. United Engineering & Foundry Co., 132 F.Supp. 597, 599 (W.D.Pa. 1955); I–XL Eastern Furniture Co. v. Holly Hill Lumber Co., 134 F.Supp. 343, 344 (E.D.S.C. 1955).

---

[6]The district judge in his written decision ruled in part:

"It should be pointed out that the AMI report relied upon by the Master (Master's Exhibit 'C') purports to adopt the Census Bureau's definition of the meat packing industry in the preface thereof. Such a definition, according to the AMI, excludes a large number of small plants which represent 15% of all meat produced and, more importantly, adequate data on those types of plants which conduct no slaughtering operations but which buy at wholesale were not available for compilation in the AMI publication (see preface to Master's Exhibit 'C'). Consequently, assuming *Pereira* to be applicable, the determination of 8.27% as a reasonable rate of return appears to be unfounded."

6. Mary Ann next contends that the district judge abused his discretion in applying the *Van Camp* formula of apportionment, because that formula did not render substantial justice in the instant case. We do not agree. Two distinct alternative approaches to allocating earnings between separate and community income have evolved over the years. The approach announced in Pereira v. Pereira, *supra,* is to allocate a fair return on the husband's separate property investment as separate income and to allocate any excess to the community property as arising from the husband's efforts. The alternative apportionment approach, which traces its derivation to Van Camp v. Van Camp, *supra,* is to determine the reasonable value of the husband's services, allocate that amount as community property, and treat the balance as separate property attributable to the normal earnings of the separate estate.

In Beam v. Bank of America, 490 P.2d 257, 261 (Cal. 1971), quoting from Logan v. Forster, 250 P.2d 730, 737 (Cal. App. 1952), the court said:

" 'In making such apportionment between separate and community property our courts have developed no precise criterion or fixed standard, but have endeavored to adopt a yardstick which is most appropriate and equitable in a particular situation * * * depending on whether the character of the capital investment in the separate property or the personal activity, ability, and capacity of the spouse is the chief contributing factor in the realization of income and profits [citations]. * * * [Par.] In applying this principle of apportionment the court is not bound either to adopt a predetermined percentage as a fair return on business capital which is separate property [the *Pereira* approach] nor need it limit the community interest only to [a] salary fixed as the reward for a spouse's service [the *Van Camp* method] but may select [whichever] formula will achieve substantial justice between the parties. [Citations.]' "

The reasoning of *Beam* was adopted by this court in Johnson v. Johnson, 89 Nev. 244, 247, 510 P.2d 625, 626–627 (1973), overruling Lake v. Bender, 18 Nev. 361, 7 P. 74 (1884), where the court ruled:

"We now depart from the all-or-nothing approach of Lake v. Bender, supra, and announce the rule that the increase in the value of separate property during marriage should be apportioned between the separate property of the owner and the community property of the spouses. . . .

". . .

"Both approaches [*Pereira* and *Van Camp*] have vitality and

may be applied as circumstances warrant. Courts of this state are not bound by either the *Pereira* or the *Van Camp* approach, but may select whichever will achieve substantial justice between the parties. . . ."

In *Van Camp*, the defendant husband was president and manager of the Van Camp Sea Food Company, to which he devoted his exclusive attention. In rejecting the *Pereira* approach, the California court held, 199 P. at 889:

"In our opinion, the circumstances attending the Pereira Case are not applicable to the facts involved herein. While it may be true that the success of the corporation of which defendant was president and manager was to a large extent due to his capacity and ability, nevertheless without the investment of his and other capital in the corporation he could not have conducted the business; and while he devoted his energies and personal efforts to making it a success, he was by the corporation paid what the evidence shows was an adequate salary, and for which another than himself with equal capacity could have been secured. . . ."

In the instant case, the district judge determined that Schulman Meats could not have been conducted without the separate property investment of capital—specifically without the SBA loan secured by the business assets. This determination was supported by the evidence.[7]

Mary Ann's remaining objections to the use of the *Van Camp* formula are meritless. She contends that the district judge erred in finding that the increased value of the business was also the result of the general increase in population in the Las Vegas area, on the ground that no direct evidence was presented of such growth or its effect on the Schulman business. Albert contends that the district judge was entitled to take judicial notice of this fact, pursuant to NRS 47.130. It is not necessary to reach this issue, since the district judge's choice of approach was *alternatively* based on an adequate ground—the importance of the capital investment as security for the SBA loan. Nothing in *Johnson* or in the *Pereira-Van Camp* line of decisions suggests that a court must identify the economic factors which caused the return on the capital investment. We

---

[7]"Q [cross examination by John Peter Lee, attorney for Mary Ann] And this SBA loan was essential to the growth of the business, was it not?

"A [by Albert] Well, the SBA loan was necessary to continue our business, or just liquidate my wholesale and just operate a little retail meat market."

find that the application by the district judge of the *Van Camp* method was inherently fair and that it did not contravene substantial justice.

7. Finally, Mary Ann urges that Albert's separate property was transmuted into community property, on two additional theories:

First, Mary Ann argues that there was an oral agreement transmuting the business into community property. In support thereof, she cites her testimony that in 1972, before incorporating, Albert expressed an intent to issue half the stock to her and that she suggested issuing all the stock jointly. The district judge refused to accept Mary Ann's statement as necessarily made.[8] Such a determination was within his province.

Mary Ann's second argument is no more impressive. She urges that the SBA loan, and therefore the assets acquired therefrom, became community property because the SBA required Mary Ann's personal guaranty. The district judge considered the evidence and found that the SBA's primary intent was to rely on Albert's separate property assets, citing Hogevoll v. Hogevoll, 138 P.2d 693, 697 (Cal.App. 1943).[9] The

---

[8]The district judge in his written decision ruled in part:

"Mary Ann argues that Albert should be equitable [sic] estopped from denying that he assured her of an interest in the business. The Court is not satisfied from the proof presented that such assurances were necessarily made but in any event, it does not appear that the circumstances were such that any assurance that may have been made was, in fact, detrimentally relied on by Mary Ann. Accordingly, the Court must reject her contention."

[9]The district judge in his written decision ruled in part:

"The only other question regarding community interest in the business is whether the proceeds of the SBA loan and hence the property purchased therefrom were acquired as community property. The evidence before the Court indicates that the creditor, Small Business Administration, in making the $440,000 loan, was relying predominately [sic], if not solely, upon the assets of the business as security for the debt. '[T]he proceeds of a loan obtained upon the credit of separate property, whether because of its hypothecation as security for repayment, or in reliance upon its ownership by the lender, are separate funds.' *In re Marriage of Mix,* 37 Cal.App.3d 801, 112 Cal.Rptr. 717, 726 (1974); *Hicks* v. *Hicks,* Cal.App.2d 144, 153; 27 Cal.Rptr. 307, 312 (1962) [sic]. When one spouse borrows money on the credit of separate property, the fact that both spouses sign a mortgage or note does not thereby transform the property into community property. *Hogevoll* v. *Hogevoll,* 59 Cal.App.2d 188, 138 P.2d 693, 697 (1943). Similarly in the instant situation, Mary Ann signed the 'stand-by' agreement and the

question of a creditor's intent is an issue of fact to be determined by the trial court, and in the instant case the record supports the district judge's finding, particularly in that the loan was secured by separate property assets.[10]

8. Mary Ann also contends that the district judge abused his discretion in awarding her alimony of $1,000 a month for 6 months only. She claims she should have received more, predicated on her ill health, the duration of her marriage, and the amount of property awarded to her. The record shows that Mary Ann was 42 at the time of trial; Albert was 64. The testimony of her ill health was uncorroborated. The marriage was of a relatively short duration. In view of the broad discretion given the district judge in determining alimony awards, Mary Ann's argument must fall, under the circumstances of the case. Buchanan v. Buchanan, 90 Nev. 209, 523 P.2d 1 (1974).

The judgment of the court below is affirmed.

GUNDERSON, C. J., and BATJER, ZENOFF, and THOMPSON, JJ., concur.

---

guaranty, together with the execution of the deed of trust simply as an accomodation [sic] to the lender who was lending money for the improvement of Albert's solely and separately owned corporation, and the presence of her signature did not give rise to any community interest."

[10]See Ford v. Ford, 80 Cal.Rptr. 435 (Cal.App. 1969) (reversing trial court's finding that requiring spouse's signature did indicate intent to rely primarily on her assets rather than property secured).