VIRGINIA KIRK CORD, Appellant, v. EDWARD D. NEUHOFF AND CHARLES E. CORD, Coexecutors of the Estate of E: L. CORD, Also Known As Errett L. Cord and Errett Lobban Cord, Deceased, and Individually, Respondents.

No. 9530

January 25, 1978

573 P.2d 1170

[Rehearing denied March 2, 1978]

*Nada Novakovich,* of Reno, for Appellant.

*Bradley & Drendel, Ltd.,* of Reno, for Respondents.

## OPINION

By the Court, THOMPSON, J.:

This case mainly concerns the validity of a postnuptial agreement purporting to settle the support and property rights of Errett and Virginia Cord.

The Cords were married January 3, 1931, and were husband and wife until Errett's death on January 2, 1974. He died testate leaving an estate valued at $39,251,149.85. His Last Will declared the entire estate to be his separate property. His widow Virginia commenced this action asserting the estate to be community property and her entitlement to one half thereof.[1]

The district court dismissed her action. The dismissal rests primarily upon a 1953 postnuptial agreement between Errett and Virginia wherein Virginia released present and future community property rights. The court found the property provisions of the agreement enforceable, and severed those provisions from other parts of the agreement limiting Errett's obligation to support Virginia which the court found invalid. Consequently, Virginia's 1953 release of present and future community property rights precludes her from now asserting a community interest in Errett's estate. The court also found her action barred by laches. This appeal followed.

1. It is Virginia's contention that the postnuptial agreement is an integrated agreement, incapable of severance, and that since the support provisions thereof are invalid, the entire agreement fails and may not be enforced in any respect. Extrinsic evidence was not offered as to the meaning of the agreement. The trial court's interpretation came from within the four corners of the document itself. In this circumstance, that court's interpretation of the agreement is not binding on this court. Messenger v. Messenger, 297 P.2d 988 (Cal. 1956).

In a different context, that of court power to modify a property settlement and support agreement, we found that the language of the agreement itself established that the parties intended an integrated agreement. Barbash v. Barbash, 91 Nev. 320, 323, 535 P.2d 781, 783 (1975). We there noted that the agreement dealt both with rights to marital property and support, that the parties desired a full and final adjustment and settlement of their property rights and claims against each other, and that they released each other from any liability for support and maintenance.

In line with Barbash v. Barbash, supra, the words of the postnuptial agreement before us renders inescapable the conclusion that the parties intended an integrated agreement and

---

[1]The Last Will gave Virginia $500,000, certain real estate and personal property. She renounced those bequests and, in lieu thereof, claimed a community interest in the estate. In a separate action, the district court ruled that she could assert a claim to one half of the community property. That decision was not appealed.

that the provisions for support and maintenance are an integral and inseparable part of their property settlement. Pertinent parts of the agreement are quoted in the footnote.[2] It is clearly expressed that they intended to settle their property and support rights and the reciprocal promises with regard to property and support were given in consideration for each other. Cf. Marriage of Dawley, 551 P.2d 323 (Cal. 1976), where the agreement stated that the provisions were severable and the court honored that expressed intention.

We already have noted the district court conclusion that the provisions of the agreement limiting Errett's duty to support Virginia were unenforceable. The agreement limited Errett's support duty to the period of five years even though they continued living together as husband and wife. Such provision violates statutory command and is void.[3] Errett and Virginia continued to live together as husband and wife until his death. Indeed, no party to this appeal challenges the district court conclusion in this regard. It follows inevitably that the entire integrated agreement must be annulled since a material part of it is illegal. Pereira v. Pereira, 103 P. 488 (Cal. 1909). The failure of the district court to so rule was error.

2. The district court found this action barred by laches. We do not agree. The policy of the law is to refrain from fostering domestic discord which may follow from litigation between spouses commenced for fear that the bar of laches would attach by lapse of time. Consequently, most jurisdictions will

---

[2]The parties hereto desire to settle now and forever all rights of property, all homestead rights, and all other property rights, including all rights of each party in and to any and all community property, if any, and claims growing out of the marriage relationship existing between them which either of them has or may have against the other, and all rights which either of them has or may have against the other, and all rights which either of them has or may hereafter have in the property, of every kind and nature, real, personal and mixed, now owned by the other, or which may be hereafter acquired by the other.

"This agreement is to be final and is to remain in effect, whether the parties remain husband and wife, or are hereafter legally separated or divorced.

"Now, therefore, in consideration of the mutual promises, covenants and agreements herein contained and to be performed by the parties hereto. . . ."

"This agreement is intended as and for a full and complete and final settlement, establishment, as herein provided, of the personal rights and property rights of the parties hereto, and each of them as regards to the other."

[3]NRS 123.080; formerly N.C.L. 3374: "A husband and wife cannot by any contract with each other alter their legal relations except as to property, and except that they may agree to an immediate separation and may make provision for the support of either of them . . . during such separation." See also Calif. Civil Code § 4802, formerly § 159.

not allow laches to run between husband and wife during the continuance of the marital relationship. Cases coll. Annot., 121 A.L.R. 1382.

A fair reading of the record before us discloses that Virginia Cord executed the postnuptial agreement for the sole purpose of saving her marriage. Thus, the circumstances are not unlike those before the court in Rottman v. Rottman, 204 P. 47 (Cal. 1921), where the court in holding the wife not barred by laches wrote:

> Not only is she the wife of appellant but according to the amended complaint, the two contracts she seeks to rescind were entered into by her for the sole purpose of securing to herself a continuance of the relations which she had a right to expect from the very fact of marriage, but which her husband had threatened to deny her. This, we repeat, places her in a position from which she may strongly combat the charge that she unduly delayed the commencement of her action. Having made a very foolish and improvident contract, treating the two as one, for the purpose of securing her rights as a wife, other than the right to support, which she cast away in order to hold the remainder, she could hardly be expected to be zealously diligent in attempting to cancel the contracts. A move in that direction might imperil the very consummation she had so devoutly wished. She was justified, without incurring the charge of guilt of laches in holding to the last possible moment to the hope that, in the language of the amended Complaint, her husband would "live with her and love her as a husband should," and that she might "retain his presence with her."

3. Since we have concluded that this action should not have been dismissed it becomes necessary to comment upon a problem which will face the district court upon remand, that is, the method to be utilized in determining whether any of Errett's estate should be apportioned to the community.

The Cords did not live in a community property jurisdiction, California, until 1937. They continued to live there, and subsequently in Nevada, also a community property state, until Errett's death in 1974. Errett's wealth in 1937 was about eight million dollars and was his separate property. When he died in 1974 the value of that estate had increased almost five fold.

The law of California and Nevada is that rents and profits from a spouse's separate property is separate property. However, it also is true that the earnings of either spouse during

coverture are allocable to the community. It is evident that these concepts come into conflict when a spouse devotes his time, labor, and skill to the production of income from separate property, or to the enhancement in value of that separate property.

It is now settled in each jurisdiction that in such circumstance there must be an apportionment of any increment in value between the separate estate of the owner and the community [Pereira v. Pereira, 103 P. 488 (Cal. 1909); Johnson v. Johnson, 89 Nev. 244, 510 P.2d 625 (1973)], unless the increment is due solely to a natural enhancement of the property, or the owner of the separate estate expended only minimal effort and there was no evidence presented attributing a value to his services. There is no suggestion that the increased value of Errett's estate was due to a natural enhancement, or that he expended only minimal effort. The evidence is otherwise and establishes that he devoted great time and energy to the management of his wealth.

The methods of apportionment are expressed in the California cases of Pereira v. Pereira, supra, and Van Camp v. Van Camp, 199 P. 885 (Cal.App. 1921), which we have approved. Johnson v. Johnson, 89 Nev. 244, 510 P.2d 625 (1973); Wells v. Bank of Nevada, 90 Nev. 192, 522 P.2d 1014 (1974); Schulman v. Schulman, 92 Nev. 707, 558 P.2d 525 (1976).

The Pereira method of apportionment is to allocate a fair return on the investment to the separate property and to allocate any excess to the community property as arising from the husband's efforts. In the absence of evidence of a "fair return" the court will adopt the rate of legal interest, 7 percent per annum. Beam v. Bank of America, 490 P.2d 256 (Cal. 1971).

The Van Camp method allocates to the community an annual sum equal to the salary which would have to be paid an employee rendering services proportionate to the husband's, and treats the balance as separate property attributable to the normal earnings of the separate estate.

The preferred method appears to be that suggested in Pereira unless the owner of the separate estate can establish that a different method of allocation is more likely to accomplish justice. In re Neilson's Estate, 317 P.2d 745 (Cal. 1962); Weinberg v. Weinberg, 432 P.2d 709 (Cal. 1967). Here, we find nothing

to suggest that a different method of allocation would be more appropriate.

The financial records of Errett's wealth, income, capital gains, etc., from 1937 to 1953 were introduced in evidence. We assume that the coexecutors can produce similar records from 1953 to the year of Errett's death, 1974. If such complete financial information is available, a yearly analysis of the income generated by Errett's activities should be made, and a yearly allocation to separate and community estates accomplished. This method is preferable to an overall recapitulation for the reasons expressed by Justice Traynor in See v. See, 415 P.2d 776 (Cal. 1966). There, in a different evidentiary setting, the court rejected a tracing methodology under which the total community income over 21 years of marriage was balanced against the total community expenses for the same period. In doing so the court wrote: "It would transform a wife's interest in the community property from a 'present, existing and equal interest' as specified by Civil Code sec. 161a, into an inchoate expectancy to be realized only if upon termination of the marriage the community income fortuitously exceeded community expenditures." Id. at 779.

The same reasoning with respect to a proper recognition of the wife's "present, existing and equal interest" [NRS 123.225] applies with equal force to the case at hand. Since there must be an apportionment of the increment in value between the separate and community estates, the "present, existing and equal community interest" of Virginia arises the very moment the increment in value is large enough to require allocation. It is evident that this end can best be realized by utilizing a year-by-year analysis.[4]

---

[4]The financial records before the court, 1937 to 1953, are revealing in this regard. A year-by-year Pereira analysis discloses that between 1937 and 1946, Virginia acquired no community property, because the yearly income generated by the preceding year's net worth was always less than 7 percent. In 1947, however, income exceeded 7 percent, thus generating community income which, when decreased by 1947 community expenses, constituted 3.5 percent of the 1947 year-end net worth. Again in 1948, the income generated by the 96.5 percent of the corpus remaining separate property exceeded a normal 7 percent return, resulting in an allocation of the excess to the community estate. This excess, when added to the income *directly* generated by the 3.5 percent of the corpus constituting community property and decreased by 1948 expenses, increased the community interest in the entire corpus to approximately 15.8 percent. In all years between 1949 and 1952, community expenses exceeded community income, thus causing a decrease in residual community holdings. Thus on December 31, 1952, approximately 11.6 percent of the holdings constituted community property.

On the other hand, a total recapitulation analysis conducted from the vantage point of 1953 would reflect that Virginia had no community property in 1953. As noted in respondents' brief: "[c]ompounding $8,356,673 at 7% per

For the reasons expressed we reverse the judgment dismissing this action and remand for trial to determine the extent of Virginia's community interest in the Estate of Errett Cord.

BATJER, C. J., and MOWBRAY, GUNDERSON, and MANOUKIAN, JJ., CONCUR.

---

year through December 31, 1952, would increase E. L. Cord's sole and separate property to $24,473,219, before there could be any community property. E. L. Cord's net worth on December 31, 1952, was $8,346,720. Therefore, obviously under the Pereira formula, there was no community property as of the date of the property settlement agreement."