ROY E. CALDWELL and PHYLLIS CALDWELL, Appel-
lants, v. CONSOLIDATED REALTY AND MAN-
AGEMENT COMPANY and KAY SULLIVAN,
Respondents.

No. 14399

August 31, 1983                    668 P.2d 284

*John P. Foley* and *Elizabeth J. Foley,* Las Vegas, for Appel-
lants.

*Darrell Lincoln Clark,* Las Vegas, for Respondents.

## OPINION

By the Court, MOWBRAY, J.:

This appeal centers on the construction of an extension clause in a printed exclusive listing agreement furnished by respondents. In an attempt to validate the clause, which is meaningless as printed when read as a whole, we construe the word "purchaser" to mean "purchase," thus giving the clause a meaning that is reasonable and consistent with the purposes of such clauses. As neither appellants nor respondents secured a purchase of appellants' property within the term of the listing agreement or the subsequent 45-day period specified in the extension clause, respondents are not entitled to a commission on the sale which eventually occurred. We therefore reverse the judgment of the district court.

### THE FACTS

In August 1979, the Caldwells entered into an exclusive multiple listing agreement with respondent Consolidated Realty and Management Company (Consolidated), in an effort to sell their bar in Henderson, the Scotch & Soda (then known as the Victory Club). The listing agreement was to expire on December 14, 1979, but it contained the following extension clause:

> In the event a purchaser is secured by said REALTOR, his agent, or cooperating REALTORS, brokers and agents, or anyone, including myself, during the period of this agreement, or the subsequent *45* days; to persons with whom REALTOR has negotiated this agreement, or offered or presented my property or who has inspected my property during the term of this listing; I hereby agree to pay said listing REALTOR *10* percent of the selling price, as commission, for professional services rendered.

The original listing price was $245,000.

In mid-November 1979, a broker from Consolidated and another broker, respondent Kay Sullivan, introduced a Mr. Blackburn to the Caldwells. About three meetings took place between the Caldwells and Blackburn with a Consolidated broker present. Two of the meetings occurred on the same day.

Ms. Sullivan took Blackburn to see an attorney to determine whether Henderson or county gaming laws would apply to the Scotch & Soda if it were converted to a casino. She also made efforts to find him a potential manager for the Scotch & Soda, and took him to the bar several times so he could evaluate the level of business.

According to Mr. Caldwell, Blackburn desired to build a casino in the Henderson area, and would have paid $225,000 for the Scotch & Soda if he could have acquired one of the properties adjacent to the bar for additional space. However, Blackburn did not want the Scotch & Soda if he could not obtain one of the adjacent properties. Caldwell met with the owners of the adjacent properties, but they refused to sell.

The three meetings arranged by Consolidated did not result in an offer during the period of the listing. Blackburn went to Texas for Christmas, and neither Consolidated nor Sullivan had any further dealings with him. Consolidated also had no contact with the Caldwells between the time of the third meeting and approximately December 1st, when Mr. Caldwell notified Consolidated that he wished to reduce the listed price to about $185,000. Caldwell also indicated at that time that he was dissatisfied with the efforts being made to sell his property.

The Caldwells maintained a relationship with Blackburn. According to Mr. Caldwell, Blackburn wanted him to manage whatever casino Blackburn eventually acquired in the area, because of Caldwell's experience in the gaming business and his gaming license. Caldwell found a 5.3 acre parcel on the Boulder Highway a short distance from the Scotch & Soda, and Blackburn purchased it for $419,000. Caldwell also helped bring some roof beams to that property to be used in the casino that Blackburn planned to build.

Finally, on or about February 13, 1980, Blackburn told Caldwell that because he wanted Caldwell to help him build and manage a casino, he would take the Scotch & Soda off Caldwell's hands for $165,000. Caldwell agreed. They consummated the sale on February 15, and recorded the deed on April 7. Blackburn died a few months later, and his casino was never built.

After Consolidated and Sullivan found out about the sale of the Scotch & Soda to Blackburn, they sued the Caldwells to recover a commission on the sale. At trial, after the close of the plaintiffs' case, the district court found no evidence of fraud or collusion, and dismissed all causes of action other than the one based on the listing agreement itself. The district court ultimately concluded that Consolidated and Sullivan were entitled to $16,500 plus costs and attorney's fees under the agreement,

as the "procuring causes" of a ready, willing, and able buyer within the meaning established by the contract and the case of Humphrey v. Knobel, 78 Nev. 137, 369 P.2d 872 (1962). The court so concluded despite the occurence of the sale more than two weeks after the expiration of the 45-day extension period established by the listing agreement.

Appellants moved to alter or amend judgment or in the alternative for a new trial. The district court denied the motion. This appeal followed.

## THE LISTING AGREEMENT

Where a broker's action to recover a commission for the sale of real property is based on a listing agreement, the terms of the agreement govern the broker's right to compensation. *See* Reese v. Utter, 92 Nev. 377, 379, 551 P.2d 1099, 1100 (1976); Nollner v. Thomas, 91 Nev. 203, 207, 533 P.2d 478, 480-81 (1975). *See also* Di Gregorio v. Marcus, 86 Nev. 674, 677, 475 P.2d 97, 99 (1970). We are not bound by the trial court's interpretation of the listing agreement in this case, because the court's interpretation arose solely from the four corners of the written instrument rather than from any extrinsic evidence as to the meaning of the terms used. *See* Cord v. Neuhoff, 94 Nev. 21, 573 P.2d 1170 (1978); Clarkin v. Reimann, 638 P.2d 857, 863 (Hawaii App. 1981). Any ambiguity in a written contract is to be construed against the party who prepared the agreement or selected the language used; where a broker has used a form listing agreement, as in the instant case, the contract shall be strictly construed against the broker as the author of the instrument. *See* Morgan v. Golder, 446 P.2d 948, 949 (Ariz.App. 1968); Sherman Agency v. Carey, 577 P.2d 759, 761 (Colo. 1978); Boutelle v. Chrislaw, 150 N.W.2d 486, 492 (Wis. 1967); McCartney v. Malm, 627 P.2d 1014, 1020 (Wyo. 1981). *See generally* Annot., 51 A.L.R.3d 1149, 1161-65 (1973).

Respondents contend that, under the wording of the extension clause noted above, they were entitled to a commission so long as they "secured" a "purchaser" by negotiating with or offering or presenting the property to the ultimate purchaser during the period of the listing agreement or the subsequent 45 days, no matter when the sale finally occurred. The district court adopted respondents' interpretation of the agreement, and found that respondents' actions during the contract period satisfied the terms of the agreement.

However, when read as a whole, as printed, the extension

clause lacks meaning. First, the portion of the clause between the semicolons has no sensible connection with the rest of the paragraph. The fragment set off by the semicolons describes a class of prospective purchasers,[1] and it would make no sense to "secure" a "purchaser" to a member of this class. Secondly, if the word "purchaser" in the extension clause were to be accepted and applied as printed (as respondents suggest), the clause would require a property owner to pay a commission even when the owner, without any participation whatsoever by the broker, secured a purchaser during the 45-day period following expiration of the listing agreement. We cannot believe that the parties intended such a result.

Lastly, under respondents' interpretation of the extension clause wording, respondents need only present the property to the ultimate purchaser during the term of the listing agreement to become entitled to a commission upon the sale of the property, whether the sale occurred during the contract term or two years later. This interpretation would allow respondents to gain commissions from sales which are causally unrelated to the brokers' actions, and would also seem to violate the policy underlying the requirement of NRS 645.320(2) that every exclusive listing shall set forth in its terms a definite, specified, and *complete* termination.

In construing an ambiguous contract, we must seek a reasonable interpretation. Crestview Bowl, Inc. v. Womer Construction Co., 592 P.2d 74, 79 (Kan. 1979). We should not interpret the contract so as to render its provisions meaningless. Phillips v. Mercer, 94 Nev. 279, 282, 579 P.2d 174, 176 (1978). If at all possible, we should give effect to every word in the contract. Royal Indemnity Co. v. Special Service Supply Co., 82 Nev. 148, 150, 413 P.2d 500, 502 (1966).

If we assume that the "r" in "purchaser" is a typographical error,[2] and we construe "purchase" as synonymous with "sale," the entire clause bears a reasonable meaning, and no word or phrase need be ignored. Moreover, the clause as construed closely resembles the sort of extension clause which commonly appears in excusive listing agreements of this kind. *See* 51 A.L.R.3d at 1156, 1175-79. *See also* Nollner v. Thomas, 91 Nev. 203, 207 n.1, 533 P.2d 478, 480 n.1 (1975) ("In case a sale is made within sixty (60) days after termination of this listing to parties with whom said broker negotiated during its

[1]Those with whom the realtor has negotiated or to whom he has presented or offered the property during the term of the exclusive listing.

[2]Given the overall quality of the form agreement in issue, we consider this assumption to be entirely reasonable.

life . . . , I agree to pay said broker the commission herein provided.'').

The purpose of an exclusive listing agreement is to secure the uninhibited assistance of a broker in obtaining the sale or exchange of a piece of real property at acceptable terms. The purpose of an extension clause is to protect the broker against fraudulent or unscrupulous attempts by the property owner to escape paying the broker for his services by delaying the time of sale. *See* 51 A.L.R.3d at 1175. A fixed and definite time limit also protects the property owner, by precluding the broker from claiming a commission on any sale that occurs after the expiration of the time limit. Our construction of the extension clause in the instant case satisfies these purposes, gives the entire clause a reasonable meaning, and reasonably carries out the parties' intent in entering into the exclusive listing agreement.[3]

Reading the word "purchaser" as "purchase," the extension clause establishes two prerequisites to the broker's recovery of a commission. First, the broker must have negotiated with or shown the property to the ultimate purchaser during the term of the exclusive listing. Respondents satisfied this requirement by showing the Scotch & Soda to Blackburn and by setting up the meetings between Blackburn and appellants prior to the expiration of the listing agreement in December 1979. Second, the "purchase" must have been "secured" during the period of the listing agreement or during the subsequent 45-day grace period. At the very least, a "purchase" cannot have been "secured" until one of the persons listed in the ageeement has produced a buyer who is ready, willing, and able to consummate the transaction on terms acceptable to the seller. *See* Estate of Greenberg. v. Skurski, 95 Nev. 736, 739, 602 P.2d 178, 180 (1979); Bell v. Krupp, 86 Nev. 247, 250, 467 P.2d 1013, 1016 (1970). A less liberal reading would require that a sale or at least an agreement to sell be executed before the expiration of the extension period. *See* 51 A.L.R.3d at 1175-79, 1208-10. *See also* Nollner v. Thomas, 91 Nev. at 207-08, 533 P.2d at 480-81 (a broker employed for a definite period of time to effect a sale of property must negotiate the sale within the time fixed in the agreement to be entitled to his commission).

---

[3]We note that our other alternative is to void the extension clause as printed. For respondents, the result in the case at bar would be the same. Respondents complain that our construction of the extension clause will force realtors to prove fraud or collusion to recover commissions on sales that occur after the expiration of the extension period. In response, we merely point out that brokers may set the duration of the extension period at whatever length they feel is necessary to protect their interests.

In the instant case, there is no evidence indicating that Blackburn presented himself (or was presented by anyone else) as a ready, willing, and able buyer prior to February 13, 1980, more than two weeks after the extension period had lapsed. Thus, respondents are not entitled to a 10 percent commission on the sale of the Scotch & Soda to Blackburn. We therefore reverse the judgment of the district court. Given our disposition of this appeal, we need not reach appellants' other contentions.

MANOUKIAN, C. J., SPRINGER, STEFFEN, and GUNDERSON, JJ., concur.